RENDERED: FEBRUARY 13, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1346-MR

JAMES M. LOVELL, AS
PUBLIC ADMINISTRATOR
AND SUCCESSOR
ADMINISTRATOR OF THE
ESTATE OF BOBBY R. RANKIN,
JR.                                                                    APPELLANT

                    APPEAL FROM BOURBON CIRCUIT COURT
v.                  HONORABLE KATHRYN GABHART, JUDGE
                    ACTION NO. 20-CI-00001

SUSAN Q. MILLER, INDIVIDUALLY
AND AS EXECUTRIX OF THE ESTATE
OF BOBBY R. RANKIN AND
SUCCESSOR TRUSTEE OF THE
BOBBY R. RANKIN REVOCABLE
LIVING TRUST; BOBBY R. RANKIN, III,
INDIVIDUALLY; AUSTIN Q. RANKIN,
INDIVIDUALLY; DOROTHY SMITH;
DEBRA RANKIN; PEOPLES
EXCHANGE BANK, INC.;
CITIZENS COMMERCE BANK, INC.;
CENTRAL BANK & TRUST CO.;
DEERE CREDIT SERVICES, INC.,
D/B/A JOHN DEERE FINANCIAL;
DEERE & COMPANY; CITY OF
NICHOLASVILLE; J. STEPHEN

BOYD CPA, P.S.C.; BEN BEALMEAR
DVM PLLC; VICTOR J. TORRES DVM
PLLC; BRIAN L. FURNISH;
KEENELAND ASSOCIATION, INC.;
TRADITIONAL BANK, INC.; AND
FARM CREDIT MID-AMERICA,
FLCA F/K/A FARM SERVICES OF
MID-AMERICAN, FLCA                                    APPELLEES


<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE:  ECKERLE, A. JONES, AND TAYLOR, JUDGES.

JONES, A., JUDGE:  This is an appeal of the Bourbon Circuit Court's Amended September 30, 2024 opinion and declaratory judgment interpreting the December 23, 2011 Last Will and Testament of Bobby R. Rankin (the "Will").  The circuit court determined the Will's inclusion of the phrase, "I direct that all my just debts and funeral expenses be paid as soon after my death as practicable," demonstrated it was the testator's ("Rankin's") intention for his residuary estate, to the greatest extent possible, to pay off his personal debts secured by his property *before* his estate devised that property to his Will's specified beneficiary, The Bobby R. Rankin Revocable Living Trust, as amended February 13, 2017 (the "Trust").  The above-captioned appellant ("Lovell") contests the circuit court's determination.  Finding no error, we affirm.

Regarding our standard of review,[1] the circuit court entered its opinion and declaratory judgment pursuant to CR[2] 12.03, and in doing so granted a motion filed by appellee Susan Q. Miller ("Miller") under that provision. Such motions

> can be granted only if, on the admitted material facts, the movant is clearly entitled to a judgment. Relief must be denied if there is a material issue of fact . . . When a party moves for judgment on the pleadings, he admits for

[1] There appears to be some confusion regarding the appropriate standard of review and its interrelationship with how the circuit court "amended" its September 30, 2024 opinion. The "original" opinion that the September 30, 2024 opinion "amended" was a prior order of September 7, 2021, that "overruled" an earlier motion for judgment on the pleadings filed by the appellants. That prior order of September 7, 2021, was interlocutory because: (1) it did not resolve the entire dispute; and (2) it did not otherwise include the requisite finality language of CR 54.02. That, in turn, meant that CR 59.05 (which applies to final rather than interlocutory orders) never applied to the September 7, 2021 order. Instead, the circuit court's authority to "amend" the 9/7/21 order derived from common law and CR 54.02. *See Tax Ease Lien Investments 1, LLC v. Brown*, 340 S.W.3d 99 (Ky. App. 2011).

With that in mind, the Estate moved (nearly three years later and after discovery had somewhat progressed) to amend the 9/7/21 order pursuant to CR 54.02 *and* CR 59.05; and the circuit court granted its motion without specifying which of those provisions it had relied upon as its "amending authority." That, in turn, seems to have led to this tangential issue and its attendant confusion: it has been suggested that perhaps, due to the lapse of time, exchange of discovery, and the (unwarranted) mention of CR 59.05, the circuit court's "Amended" September 30, 2024 opinion effectively granted *summary judgment* rather than *judgment on the pleadings*.

To be clear, it did not. True, the order recites that none of the operative facts are controverted – something that a summary judgment order might state. But, the only information that the circuit court reviewed in its September 30, 2024 "amended" opinion consisted of: (1) the operative Will; (2) the operative trust agreement; and (3) information otherwise gleaned from the allegations of the parties' complaint and answer (*i.e.*, the date of the decedent's death, the appointment of the executrix, the proceedings in district court litigation). As page 6 of the appellant's brief clarifies, that information was in play and subject to a motion for "judgment on the pleadings" before *any* discovery was taken – meaning it was information that was set forth in, attached to, or otherwise referenced in the pleadings. That information, in other words, was not "outside" the pleadings so as to change the standard to one of summary judgment. *See Netherwood v. Fifth Third Bank, Inc.*, 514 S.W.3d 558, 563-64 (Ky. App. 2017). Absent more, there is no reason to depart from the standard of review applicable to CR 12.03 motions.

[2] Kentucky Rule of Civil Procedure.

the purposes of his motion not only the truth of all of his adversary's well-pleaded allegations of fact and fair inferences therefrom, but also the untruth of all of his own allegations which have been denied by his adversary. The question thus presented is one of law and requires an examination of the pleadings.

*Archer v. Citizens Fidelity Bank & Trust Co.*, 365 S.W.2d 727, 729 (Ky. 1962) (citations omitted).

The purpose of [CR 12.03] is to expedite the termination of a controversy where the ultimate and controlling facts are not in dispute. It is designed to provide a method of disposing of cases where the allegations of the pleadings are admitted and only a question of law is to be decided. . . . The basis of the motion is to test the legal sufficiency of a claim or defense in view of all the adverse pleadings.

*City of Pioneer Vill. v. Bullitt Cnty. ex rel. Bullitt Fiscal Court*, 104 S.W.3d 757, 759 (Ky. 2003). We review appeals concerning CR 12.03 *de novo*. *Scott v. Forcht Bank, NA*, 521 S.W.3d 591, 594 (Ky. App. 2017).

Rankin's Will and his separate Trust, which are the focuses of this appeal, were attached to and part of the pleadings. There is no dispute that Rankin's Will is valid, and that the property at issue in this matter was properly considered a probate asset.[3] Rankin's intentions regarding that property must therefore be "drawn from the four corners of his [W]ill." *Howe v. Howe's Ex'x*,

---

[3] Real property is not a probatable asset unless, as here, it is otherwise specifically provided for by a testator in his will. *Wood v. Wingfield*, 816 S.W.2d 899, 902 (Ky. 1991).

287 Ky. 756, 155 S.W.2d 196, 200 (1941) (citation omitted). In other words, his intentions must be "derived from considering the [W]ill as a whole and no single part may be separated and held up as evidence of [his] intent." *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (citations omitted). "[I]f a will is unambiguous, no construction is called for, and extrinsic evidence may not be introduced as an aid to construction." *McGowan v. Bogle*, 331 S.W.3d 642, 647 (Ky. App. 2011) (citation omitted).

With that in mind, we begin our analysis with Lovell's argument that, in his view, the Will did not include any directives regarding the payment of liens or mortgages associated with Rankin's properties; and that because the Will included no such directives, Rankin's intention must have been for his residuary estate not to satisfy those liens or mortgages before devising them to his trust.

Lovell is incorrect for two reasons. First, if a will does not include any directives regarding the payment of liens or mortgages on the testator's property securing the testator's indebtedness, Kentucky law *presumes* the testator's intent was for the residuary estate to pay off that indebtedness to the greatest extent possible for real property devised to specified beneficiaries. As the circuit court aptly explained in its dispositive opinion,

> The common law in Kentucky can be summed up by a review of *Blanchard v. Herbert*, 5 Ky. Op. 8 (Ky. 1871); *Tatum v. Gibbs*, 41 S.W. 565 (Ky. 1897); and *Hedger v. Judy*, 26 S.W. 586 (Ky. 1894). As

-5-

summarized in 2 Ky. Prac. Prob. Prac. & Proc § 1417, the law in Kentucky presupposes that exoneration of debts is the default rule unless the testator expressly states otherwise:

> At common law the specific devisee of real property was entitled to have the mortgage on the devised property paid in the same manner as any other claim. In the absence of an expression of a contrary intention, it was said that there was a presumption that the testator intended to exonerate the property. Kentucky appears to follow the common law presumption except as modified by the principles of contribution. Thus, when property is specifically devised upon which there is a lien created by the testator, *the lien is treated as an estate debt and must be paid out of the residuary estate or the general legacies, unless the will reflects an intent on the part of the testator that the devisee should take the property subject to the lien.* . . .
>
> . . .
>
> The right to contribution does not apply to a residuary legatee.

(Emphasis added, footnotes omitted.) As to determining the residue of the estate, Kentucky Courts define the word to mean "That which remains after a part is taken." *Hager v. Becker*, 220 S.W.2d 839, 841 (Ky. 1949). In the context of estates, the term residue "may be defined as that which remains after discharging all legal and testamentary claims on the estate or as that which is left over after the payment of charges, debts, and particular legacies." *Howe*, 155 S.W.2d at 201 (citations omitted).

. . .

The common law provides for a scheme for paying debts when a will is silent:

> The general rule is, in the absence of a contrary intention appearing in the will, or modification by statute, that residuary gifts are to be first appropriated in satisfaction of abatement deductions; and if they are insufficient for that purpose, then resort is to be had to general legacies of personal property, and if they are insufficient, the next available class for that purpose is specific gifts of personal property, and lastly specific devises of real estate. If, however, any particular class of gifts are not entirely consumed in satisfying the abatement, then all gifts within that class should be ratably reduced in proportion that the entire amount of them not consumed bears to their total amount.

*Howe*, 155 S.W.2d at 200. General devises are to be used first to pay debts before specific devises:

> In the event of a deficiency of assets a specific legacy will not abate for the benefit of a general legatee, but general legacies will abate in order to pay the specific legacies in full, even if this involves the complete obliteration of the general legacies. If a partial abatement is necessary the abatement of general legacies will be pro rata.

*Id.*

. . .

-7-

The case of *Landrum v. Landrum's Adm'x*, 218 S.W. 274 (Ky. 1920) went a step further in interpreting principles developed in the *Blanchard* decision by indicating that a specific devisee could insist that the mortgage debt be paid out of the general devises:

> It was held that the specific devisee was entitled to require the debt paid out of the residuary estate which was devised generally upon the principle that the rights of the general devisees are subservient to the rights of the specific devisees with respect to the payment of the testator's debts as a general rule. If the house and lot which was the subject of the specific devise had been charged by the testatrix with the payment of the debt which was a lien upon it, a very different state of case would have been presented from that which was presented by the record in that case, and a different conclusion would have been arrived at.

*Id*. at 277. Generally speaking, debts of the deceased should be paid from undevised property. *See Louisville Trust Co. v. Walter*, 207 S.W.2d 328, 330 (Ky. 1948).

> There are few cases touching on the question of whether lapsed legacies should primarily bear the burden of debts of the testator and costs of administration, or it should fall in part on the residuary legacies. The general rule is laid down in 69 C.J. 'Wills' § 2570: 'While a testator may, by charging specific property with the payment of debts, exempt undisposed of property from such payment, *his intention to do this must be very clearly manifested by the terms which he uses*, for as a general rule, regardless of express directions to sell certain property and apply the proceeds to

the payment of debts, or a bequest of property subjecting it, as against other property bequeathed, to the payment of debts, *property undisposed of must first be resorted to for payment of testator's debts.* * * * Lapsed legacies of the residue will first be applied before resort will be had to the residuary legacies effectually devised or bequeathed.'

*McLeod v. Andrews*, 303 Ky. 46, 51, 196 S.W.2d 473, 476 (1946) (emphasis added). Therefore, if the testator intends for the debts to survive and be the responsibility of the beneficiary of the specific devise, he must clearly and expressly state by the manifest terms in the Will or Trust in the specific devise.

As for the second reason Lovell is incorrect, the Will *did* – by including the phrase, "I direct that all my just debts and funeral expenses be paid as soon after my death as practicable" – direct that Rankin's debts associated with liens and mortgages on his properties should be paid by Rankin's residuary estate. Again, we turn to the circuit court's cogent analysis:

"The phrase 'just debts' is one that is frequently used in wills. Indeed, its use is very much a custom in the writing of wills. The expression in a will of a desire that debts be paid is in reality directing that a thing be done which the law requires to be done anyway." *Jones' Ex'r v. Jones*, 275 Ky. 753, 122 S.W.2d 779, 780 (1938). The *Jones* Court further referred to "just debts" as "legal debts." Black's Law Dictionary, 6th Edition, defines the following terms that are of import to the Court's analysis: A "debt" is defined as "a sum of money due by certain and express agreement." This can be a "secured debt" such as a "mortgage." A "mortgage" is an instrument used to bound a property that serves as "security interest"

securing the "promissory note" which is the "promise or engagement, in writing, to pay a specified sum at a time therein stated, or on demand, or at sight, to a person therein named, or to his order, or bearer."  As such, in this context, the mortgage or encumbrance on the specifically devised properties exists as a result of the promissory note signed by the Testator before his death demonstrating the debts owed by the Testator.

The Kentucky Supreme Court has determined that a promissory note is separate from the mortgage and is a separate enforceable contract from the mortgage:

> 'Even when a promissory note is incorporated into the mortgage, it is still independent of the mortgage and is a separate enforceable contract between the parties, and logically, even when a mortgage is incorporated into a promissory note, the note remains independent of the mortgage and is a separate, enforceable contract between the parties.'

*Lawrence v. Bingham Greenebaum Doll, L.L.P.*, 599 S.W.3d 813, 821-22 (Ky. 2019) (citations omitted).  All of this is to say that, setting aside that mortgages exist as encumbrances on the properties in the specific devises, the inexhaustible directive to the Executrix by the Testator is to "pay my just debts" which includes any promissory notes signed by the Testator during his lifetime that still exist at the time of this death.

As to the decision in *Pruitt v. Esham*, No. 2019-CA-1723-MR, 2021 WL 1327177 (Ky. Ct. App. Apr. 9, 2021),[4] the Court of Appeals merely applied long standing law and the principles stated above when

---

[4] This unpublished opinion was cited by the circuit court – and is cited by this Court – pursuant to Kentucky Rule of Appellate Procedure ("RAP") 41(A) as illustrative of the issue before us and not as binding authority.

determining that it was appropriate for a mortgage loan to be paid out of the estate pursuant to the language "all my just debts . . . be first paid from my estate as soon as practicable after my death":

> When interpreting a will, "[a]s in any case where a court is called upon to interpret a document, the first and most important guide is the plain language of the instrument." *Benjamin v. JP Morgan Chase Bank, N.A.*, 305 S.W.3d 446, 451 (Ky. App. 2010) (citation omitted). "If the language used is a reasonably clear expression of intent, then the inquiry need go no further." *Id.* at 451-52 (citation omitted). Herein, the language of the will plainly states the debts shall be paid from the estate. There is no language showing Waddle intended for Appellee, as the life tenant, to be solely responsible for the estate's debts. On this basis, we find no manifest injustice resulted from the circuit court's interpretation of the will.

*Id.* at 5. As such, Courts have treated mortgage debts as "just debts" to be paid first.

In short, the Will at issue in this matter included no language clearly and expressly stating it was the testator's intent for any mortgage or lien debts associated with specific devises to survive and be the responsibility of the beneficiaries of the specific devises. Instead, the Will included language to the contrary. As such, the testator, Rankin, intended for his residuary estate to satisfy any mortgages or lien debts associated with the specific devises in the manner set forth above.

Notwithstanding, Lovell contends the circuit court should have ascertained Rankin's intentions by resorting to parol evidence – rather than the four corners of the Will – due to various issues stemming from the language of a wholly separate document, *i.e.*, the agreement Rankin executed to establish his Trust ("Trust Agreement").  Recall, Rankin's Trust is the sole beneficiary of his Will.  Lovell's contentions in this vein are four-fold.  First, he notes that the Trust agreement provides:

### ARTICLE IV
### DISPOSITIVE PROVISIONS AFTER DEATH OF SETTLOR

> A. <u>Payment of Expenses of Settlor's Estate</u>.  On the death of the Settlor, the Trustee may, in the Trustee's discretion, pay, out of the trust, the debts of the Settlor; the estate and inheritance taxes, including interest and penalties, arising because of the Settlor's death; the last illness and funeral expenses of the Settlor; and attorneys' fees and other costs incurred in administering the Settlor's estate. . . .

Lovell believes this *discretionary* provision in the Trust – when contrasted with the provision of the Will that *directed* the executor of Rankin's estate to pay all of Rankin's just debts and funeral expenses as soon after his death as practicable – created an ambiguity that should have warranted the admission of parol evidence to further explain Rankin's intentions regarding Rankin's outstanding lien and mortgage-secured debt.  In the words of Lovell's brief, if "the Will required all debt be paid *before the Trust is even funded* . . . then the

-12-

provisions of the Trust giving the Trustee discretion and authority to pay debts from the Trust would have been unnecessary as there would have been no debt flowing into the Trust." Lovell Br. at 11 (emphasis added).

However, even if it were proper to import ambiguity into the Will from the wholly separate Trust Agreement (and it is not), the glaring flaw in Lovell's argument is its assumption that Rankin's Will was the only anticipated source of funding for Rankin's Trust. To the contrary, Rankin's Will and Trust both assumed the Trust could have been funded prior to Rankin's death, by means other than through Rankin's Will. That much is obvious because Rankin's Trust initially *predated Rankin's Will* by a year and a half,[5] and every iteration of the Trust Agreement provided that "[a]dditional property [could have been] added to the trust estate at any time by [Rankin], or by any other person or person, by inter vivos or testamentary transfer." *See* Trust Agreement, Article I, Section (C). This is also apparent from the plain language of the Will, in which Rankin directed:

> All the rest, residue and remainder of my estate, both real and personal and of whatever kind and wherever situated, I give, devise and bequeath to the individual(s) or bank then acting as Trustee under that certain Trust Agreement designated as **The Bobby R. Rankin Revocable Living Trust**, of which I am the Settlor and the Trustee, *to be combined with the other assets of the trust* and held, administered and distributed as a part of that trust,

---

[5] Recall, Rankin executed his Will on December 23, 2011. He established the Bobby R. Rankin Revocable Living Trust on May 12, 2009. He subsequently amended it on December 23, 2011, and on February 13, 2017.

-13-

> according to the terms thereof and any amendments made to it prior to my death. . . .

*See* Will, Article VII, Section (1) (italics added).

Because the Trust could have been funded prior to Rankin's death by means other than through Rankin's Will, any number of circumstances could have called for the trustee to exercise discretionary power to pay Rankin's debts out of the trust. For example, if property were added to the trust before Rankin's passing, that property could have been encumbered by debt, permitting the trustee to pay the debt thereon. Additionally, if the residue of Rankin's estate was insufficient to pay Rankin's debts, the trustee could have used any previously added trust property to pay the remaining debts. Accordingly, even if the Trust agreement's grant of discretionary power to the trustee to pay Rankin's debts could properly be considered when interpreting Rankin's Will, the grant of that power created no conflict or ambiguity.

Second, Lovell notes that the May 12, 2009, iteration of the Trust Agreement directed that one of Rankin's friends was to receive a vehicle "subject to any and all indebtedness, if any[.]" *See* May 12, 2009, Trust Agreement, Article IV, Section C.3. Seizing upon this quote, he argues it demonstrates the interpretation of Rankin's Trust – and by extension Rankin's Will – cannot be guided solely by the four corners of each instrument; and he concludes:

"Therefore, the trial court erred in summarily ruling that Rankin Sr. intended for no mortgages to encumber the specific devises in the Trust." Lovell Br. at 13.

The logic of Lovell's argument is difficult to follow, but to the extent that quote bears any significance, it does not aid his appeal. That quote merely demonstrates that apart from being presumptively aware of the law (as everyone is), Rankin was actually aware of the law – it illustrates that when Rankin wanted a beneficiary to take a specific devise subject to indebtedness, he understood the requirement, as set forth at length above, of using express language to effectuate his intention.

Third, Lovell notes that if Rankin's estate pays the outstanding mortgage and lien indebtedness associated with the properties before devising them to the Trust (which is governed by the Trust Agreement as amended February 13, 2017), the result will be that appellee Susan Q. Miller (as a beneficiary of the Trust) will receive more property than two other beneficiaries of the Trust, Bobby R. Rankin III and Austin Q. Rankin. He also notes that the (now superseded) 2009 and 2011 iterations of the Trust Agreement would have given Miller less property than what Bobby R. Rankin III and Austin Q. Rankin would have received. From this, he concludes: "Whether this result was Rankin Sr.'s intent should be decided by a fact finder, not summarily." Lovell Br. at 13.

If this was meant to be an argument, it fails. Settlors sometimes change their minds, and trusts can be amended. Absent any allegation that Rankin suffered from duress or lack of capacity when he executed the 2017 amendment to his Trust Agreement – and there have never been any such allegations in this matter – it is of no import that Bobby and Austin are now receiving less than Miller.

Lovell's final argument in the vein of ambiguity is that "two judges were presented with the same Will and Trust and the same arguments but came to opposite conclusions. A document is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." Lovell Br. at 13.

This argument also lacks merit. For context, Lovell is referring to the difference between an interlocutory opinion the circuit court rendered September 7, 2021, and the final opinion it rendered September 30, 2024. Both of its opinions interpreted the Will. In the former opinion, the circuit court wholly disregarded the phrase "I direct that all my just debts and funeral expenses be paid as soon after my death as practicable"; it did not apply the presumption of exoneration; and it consequently determined Rankin's intent was *not* for his residuary estate to pay off his personal debts secured by his real property before his estate devised that real property to his Will's specified beneficiaries. In the latter opinion, the circuit court gave meaning to the phrase it had previously disregarded; it applied the

-16-

presumption of exoneration; and it consequently determined Rankin's intent *was* for his residuary estate to pay off his personal debts secured by his real property. This is not an example of language in an instrument being reasonably susceptible of different or inconsistent interpretations. This is an example of a court misapplying the law in its initial interpretation of unambiguous language, then correctly applying the law to that language upon reconsideration.

And that, in turn, leads to the last argument Lovell posits in this appeal. As indicated, the circuit court's September 30, 2024 final order effectively reconsidered its September 7, 2021 interlocutory order. It did so in response to Miller's timely motion for reconsideration. Lovell asserts it was improper for the circuit court to grant Miller's motion because, in his view, the standard for granting such a motion was not met at that time. *See, e.g.*, *Gullion v. Gullion*, 163 S.W.3d 888, 893 (Ky. 2005) (explaining a CR 59.05 motion may be granted to correct manifest errors of law or fact upon which the judgment is based; so that the moving party may present newly discovered or previously unavailable evidence; if necessary to prevent manifest injustice; or because of an intervening change in controlling law).

However, the circuit court had jurisdiction to amend its interlocutory order when it did so. And, even if the circuit court somehow exceeded the parameters of *Gullion* by granting Miller's motion, its amended order of

-17-

September 30, 2024 achieved the correct result. Lovell has identified nothing more than what could at most be considered harmless error. *See* CR 61.01.

Considering the foregoing, we AFFIRM.

ECKERLE, J., CONCURS.

TAYLOR, J., CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:

David J. Guarnieri
Emily D. Penn
Lexington, Kentucky

BRIEF FOR APPELLEE SUSAN Q. MILLER, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF BOBBY R. RANKIN AND SUCCESSOR TRUSTEE OF THE BOBBY R. RANKIN REVOCABLE LIVING TRUST:

J. Wesley Harned
Melissa A. Stewart
Lexington, Kentucky